Good afternoon, ma'am. Please to the court. My name is Matt Kocanower. I'm an assistant attorney general. I'm going to turn the volume up a little bit. You have ten seconds. Let's try that again. Please to the court. My name is Matt Kocanower. I'm an assistant attorney general for the state of Montana. Today I'm representing the defendant's squad on the appellant's linked reserve. Three minutes to call time. While the Supreme Court has not always spoken consistently about campaign finance corruption, two things have been constant over the past 40 years. Since Buckley, the court has recognized that states have an interest in preventing corruption, and quote-unquote, quote-unquote, corruption, as well as the appearance of corruption that's inherent in a system of large contributions. And since Buckley, the court has recognized that closely drawn contribution limits are a constitutional way for states to address these interests. Montana has these interests, and we present it to the district court, case law, and evidence supporting that our limits further these interests. And closely drawn under the element framework, our limits for them have been upheld. Although the district court correctly cited the element framework, it went astray when it went to apply it. It held the state to a standard that would require us to show actual corruption, and it misapplied the tailoring factors. So we're here today asking this court to correctly apply the framework and to reverse the district court's rate of summary judgment to the plaintiffs and to reverse the district court's denial of our motion for summary judgment. So the standard of the first instance is substantial interest. What is it that you think you have to show among those three threats? Is that the standard, the language that we should be looking to? I think that's correct, Justice Breyer. And I think that when we look at the sufficiently important interest, everyone agrees that states have a sufficiently important interest in preventing quid pro quo corruption or the actual occurrence. I hesitate a little on the evidentiary side of things, mainly because the Supreme Court has determined that direct contributions, and again, we need to remember we're talking about base limits that are directed to a candidate. And when we're in this area, we're not on a clean slate. The court has held that in those types of limits, the risk of corruption is inherent. And so to the extent that we have to... Where has the Supreme Court held that the risk of corruption is inherent? In Buckley, Justice Breyer. So in Buckley, the Supreme Court was concerned about quid pro quo corruption, of course, but it went farther. The concern in Buckley was with large contributions. That's what the court said. The problem with large contributions is that inherent within those is the public's awareness of direct opportunity. Well, you have to show us that there are large contributions that you inform the case. Well, I think that that would fall really close to a draw. And that's certainly how the court has in the past, the Supreme Court, has approached contribution limits, is to look at, to accept the interest, and then to proceed to a tailoring. If we look at, for example, Randall, which is the only case that the Supreme Court has struck down limits, they accepted that even though Vermont's limits were extremely low, that that was a legitimate objective that they were aiming at. So then the question was, were they tailored? And East Ender, I don't think that's quite correct. So we only have to show that they're large. I think that that goes to whether or not the limits are inherent. If there's an inherent risk, to use your words, and I'm sorry for using such vicious words, of quid pro quo, cutting into large contributions, then the court would say, well, it's a matter of law because the Supreme Court has struck down the limits of contributions. The Supreme Court says that. Well, I think it's as simple as that. You just made a comment that whether or not our limits are narrowly focused. Now, it was simply plain and clear. My work, in other words, is that I'm mysterious. I didn't make those up. I'm quoting from Edelman, which quoted Buckley. And so it says, the material is true, only that the perceived threat is on the looser. And that's what Edelman said. And my question was to see if you agreed with that, because the district court then looked to the evidence that you put forward and found it wanting, because he was able to distinguish the various items to his satisfaction. It struck me that these were, he was looking for a proof of actual corruption. And so I want to make sure, I'm sure Mr. Bob has his own view of it, and I wanted to know what your view was. So we know, but what's the debate here on the first row? And so, to get to that question, Mr. Chair, I think that that is absolute, that the standard is correct. And maybe I'm getting turned around trying to phrase things as matters apply and whatnot. I believe that the evidentiary standard that we have is level. It's method. It's the one that you recited from Edelman. To show that, and I believe that this court's case has made clear that we can rely on case law in addition to the actual evidence. So the cases that I've discussed today, I think, go to satisfy part of that evidentiary standard. You're relying on what piece of this evidence to demonstrate? I'm sorry. I thought you said we can rely on something besides the evidence. What piece of it? Case law. Case law. Case law. Case law. Yes, Your Honor. And, again, I think it's important to get back to that question that you kind of touched on about whether or not it's the end of the game if we show that they're narrowly focused. I think that we have to acknowledge that limits do have an impact on candidates that have an impact on donors. And so that's why, in a closed-in process, it's not sufficient to just say, okay, they're narrowly focused, and that's the end. The question still remains, is there a choice for maxed-out donors to be able to affiliate with candidates and do the 1011 self-laws that make preventive candidates be able to amass the resources necessary? We have found on the ground that there was no sufficient evidence of actual corruption before this research. Dr. Cameron? It's important to me that you have evidence of actual corruption that we should rely on as opposed to maybe, you know, just to judge them. I mean, I don't know if it has been in any committee, but I think you went very carefully through the evidence of actual corruption. You mean that you went out to look for some evidence of actual corruption? Well, I think that what we have is evidence of actual corruption in the sense that it may not be bribery. I don't think we came forward with anything that's bribery. So the point is, is there something in the bribery that says they colluded in a call for approval? Yeah, I believe that Senator Anderson's destroy after reading letter, which this court did in Adelman, but I think it's worth another look with the narrower standard, where he was urging his fellow Republicans to vote for a bill because they had gotten so much money from an insurance pact and that they should therefore pass that bill because it was important to the pact and because there was going to be more money in the future. Question to you, next. How does that bill pass? No, that was not your question. What official act of Senator Anderson or any of the other beneficiaries of that money constitute a quid? Well, to be fair, I don't think that... I think that if we were in a bribery conviction, looking at a bribery case, we would have to show that. But I think... Senator McConnell, certainly, is in contrast. We have to show not only that the politician did some favors in response to contributions, but that means that the beneficiary act as a consequence of the money that they received. Okay. Report to me, Senator Anderson, if any other legislators are officially linked in terms of their meaningful quid pro quo action. I think that urging your fellow senators to vote for a bill is an official act. It's not a bribery. It's not... We're not in a bribery standpoint where we're turning it into being an official act as it's in that statute, which the Supreme Court... So the state could bind a legislator to his co-religionaries, so that the co-religionaries would be an official act in the meaning of a quid pro quo, according to the U.S. Constitution? I think that it is evidence of... So let me be clear. Partly the concern was that large contributions could be given to secure a quid pro quo. This isn't talking about a distinct bribery. It's talking about pay-to-play. It's talking about a relationship where large contributions come in. Pay-to-play can mean pay to pledges or to creative funds. Those two are not quid pro quo. Well, I think that's true when we're talking about mere insolence and mere excess, yes. So how does Senator Andrews' exhortation to his fellow Republicans in spreading the 1917 Official Act count on many officers in Montana in exchange for the receipt of any money? I think that our evidence... You have to satisfy actual, or it can be the appearance of, corruption. That's correct. And I think that our examples that we have pull more to that interest. So if you satisfy that problem, then you're okay, right? So you keep wanting... I think you want to talk about the narrow tailoring and you're going to run out of time. So maybe you ought to turn your attention to why the limitations are focused and narrowly tailored. Are contribution limits really sufficiently important an interest? Because they focus on large contributions. When Jonathan Modal, the drafter of I-118, went to draft contribution limits, he wanted to focus on truly large contributions. This purpose was not just plucked out of thing, either. So this defined that when you go to do campaign finance reform, you look at the Supreme Court framework that's out there, and you try to operate within the window that the Court has left, and you campaign contributions, that is buckling. And Buckley identified that large contributions were a problem, that they were where the actuality and the potential for corruption exists, and where they're adhering. So our limits focused on those. And we did also present evidence that I think winds up quite closely with the examples of corruption that the Court found in Buckley. We looked at the Senator Tuckman's offer, or Senator Tony, for example, where he testified about an offer for $100,000 if he and his fellow senators agreed to bring a right-to-work bill to a vote. This is discussing official action, and this is discussing an exchange of money for that action. Was that money received? I'm sorry? Was the money received? No, Your Honor, the... Was that money directed to home-gate persons who had already publicly signaled that they were in a position to vote? No, Your Honor, there's nothing in the record that indicates that it was to all of the Republican senators as far as I can tell. That's not as possible. And that is not a question in my question. Find the appearance of corruption. This is a phrase I'd like you to talk about. And it's, quote, public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions to a particular candidate. I want you to concentrate on the beginning of that phrase. Public awareness of the opportunities. Is there any evidence in the record as to his surveys, polls, or learned treatises that reflect Montana's public awareness of the possibility of corruption, or quote, quote, quote, corruption, from financial contributions? Your Honor, I would point this part back to you. In the moment where the surveys were first discussed, in talking about, and granted it was a broader corruption interest that was at play there, but I think that the examples that are listed in the moment also send a narrower corruption interest when you look at the appearance of corruption. They show that the public was clearly aware of Senator Anderson's letter. There were five different investigations. Granted, they didn't result in a conviction of some sort, but certainly the public was aware. We have several of the 2010 candidates that were heavily publicized in the newspapers in Montana where we have three state court judges that we presented to the district court where the courts found, in fact one jury found, that candidates had taken corporate contributions which are illegal in Montana. We have, in fact, since this appeal was pending, another senator has also acknowledged that he took illegal corporate contributions. These are significant because in Buckley, the court specifically cited two illegal contributions, illegal corporate contributions, as supporting that there were abuses taking place, that contribution limits could take aim at, so they're very significant. The district court decisions also have determined that those two candidates had engaged in quote-unquote corruption by exchanging their loyalty to the corporations in exchange for these illegal corporate contributions. This is a voter initiative, right? That's correct, Judge Fitzgerald. Do we weigh that as the evidence of public awareness? Yes, Judge Fitzgerald. I believe that the issues, and I apologize, I have a black number in my head right now, but I believe the elements of- So it was 18? Excuse me? 118? Well, I mean, the percentage of voters that passed, and it was quite high, I believe it was close to 70%. I would like to ask you about the aggregate limits and then it seems to come, we started with a nice aggregate limit, more carefully than direct contribution limits, so can you talk to me a little bit about what role the aggregate limits play on the agenda for regulation of political campaigns? Yes, so Judge Merdita, we have aggregate limits, the statute refers to this aggregate limit to individual contributions. That's actually a number that you can go up to through a number of different contributions in the political party context. It's referred to as an aggregate limit as well, and in that case, what we're talking about there is that the contribution to a House candidate, for example, it's $850, and $850 can come from any of the political party committees, the National Party, anything like that, so they can aggregate their funds to make that. Once again, the statute defines them and states them as one entity, so the Republican Party and its committees is treated as one individual donor, the Democrat Party the same way, independent the same way, so they can aggregate their funds, they can get funds from different places to make that contribution. It's essentially a base limit. And so what do you think the practical effects of the aggregate limits are? Because I don't think the Supreme Court spent much time in that area. Right. I think that the practical is that it really is a base limit on political parties. It functions as a base limit. It is a... It's not an aggregate in the sense that the Constitutional Court was dealing with aggregate limits or anything remotely like that. If there's no further questions, I'd like to say we'll see you in a second. I'm going to keep you in trouble with those ideas. May it please the Court. My name is Jim Bobb. I represent the plaintiffs. This case is not on the black side. Not once did the state mention that in 1987 the state of Montana adopted contributions limits, $1,500 for governor down to $300 for state senator and state rep. Those limits were challenged. These new limits, which cut those amounts by 75% in 1994, had been challenged. They adopted limits of $400 down to $100. That is the reduction in the contribution limits that we are challenging. That is the truth that they have to present, in our view, under your remit. And that is evidence that a prior limit, say of $1,500 for governor, were not adequate to address the state's, we agree, generally, in the abstract, legitimate concern about large contributions having quick, quick corruption. It's that cutting of those limits down to $400 that they have to justify. I mean, after all, $1,500 was already cutting out large contributions. We weren't in the Buckley situation, where there were no limits. People were given millions of dollars. And people rightly said, and the court found, that giving millions of dollars to a candidate can give rise to both the actuality and the perception of quick, quick corruption. The limits that were cut were $1,500 down to $300. And of course, what we know about limits is that the Supreme Court in Buckley, in mid-Spring, approved $1,000. The court in Randall struck limits of $400 down to $100. Very similar, but lower than the Montana limits. And we know, in looking at Randall, that they didn't just accept cutting limits, cutting contribution fees and limits. That case involved a substantial trial, I will note as well. And the decision there is replete with evidence. Now, you asked for evidence. In your remand, you asked the state of Montana to do and the district courts to do first. One, is there an adequate evidence that the limitations furthers a significantly important state interest? In other words, cutting the prior limits, 75%, one, is there evidence that that furthers a sufficiently important state interest? That's a good question. And I hope that I had focused on this aspect of your argument. I'm looking at our opinion in the first case. And it starts in Section 1A, since 1994, Montana limited how much individuals and so on can contribute. Did we talk about the 75% reduction in our opinion? No. Why is it all being raised at this point? Did you raise it? We raised it. Of course we raised it. I mean, because we were challenging the reduction of limits. There were no limits. And all of a sudden, they had limits. I mean, we were challenging cutting these limits. Nobody challenged the 87 limits. And so I can't account for the fact that you didn't repeat that history. But I believe that that's the relevant inquiry here. Now, they say that they don't have to prove it. Well, number one, you required them to prove it. And then, of course, it's logical that you would require them to prove it. To re-evaluate under Adelman. It seems that Margaret actually told them to re-evaluate, for the district court to re-evaluate under Adelman, also considering maybe other recent decisions and let us know what happened. And so the district court went through the factors. Along that distinction, a lot of discussion here. I'd like to hear your view on it. Is what the standard is for the government at this point in time? And whether or not that burden is low or high? And whether it's actual corruption or the appearance? Because it seems like there is an argument in appearance. And I guess I wanted to ask you, do you agree that appearance is enough and that the evidence that they show, does it meet that little bar? Or why doesn't it meet it? Well, it has to do with appearance. I think it has to be tied to the actuality. In other words, First Amendment rights cannot be sacrificed just because the media makes up stories. Or describes it. Or describes what you've been doing. Do we have that? Or does corruption have to reemerge before it can take steps? Does Montana have to let corruption reemerge? Well, I think when we're talking about million dollar contributions, no, it doesn't have to emerge. That was the situation in Buckley. Here, we had a contribution on this already of $1,500. And by anybody's, you know, by many people's account, would have already eliminated large contributions that gave rise inherently to the specter. And now they've cut them down to $400. Well, I guess on the proposition that. Well, they cut them down to $400. That's right. Okay, so. Well, what's the evidence that contributions of over $400 up to $1,500 gave rise to anybody's legitimate concern about the actuality or appearance of corruption? That's the question. Well, you know, there's millions of millions. What could be produced? Well, two things. The actual evidence that there are politicians in Montana that would engage in a, quote, direct exchange of an official act for money. That's the McCutcheon definition of, quote, quote, corruption. That's real. People have talked to me about the declaration of Senator, State Senator Tubman, who detailed detailing the offer of $100,000 to a Republican legislative campaign committee in exchange for introducing and voting on a right to work bill. Why isn't that sufficient? That was rejected. Well. That is not evidence for, quote, quote, corruption. Nobody. That is. Never. Well, that is not evidence that any politician in Montana would agree to such an exchange. What about the declaration of a misuphonal note in upcoming consideration of potential quid pro quo corruption in a sensing phase of conviction for violating campaign contributions? In each of those cases, there were two default judgments. None of which charged quid pro quo corruption until after your remand and in the sentencing, which was ex parte, because there was no defendant there. The mogul introduced that as the prosecutor and as the witness of the facts. We submitted affidavits. He never talked to anybody involved in that. Anyone. So there was no way that he knew that there was a direct exchange for the $9,000 in services that those two state reps received, the illegal corporate contributions that they received. Now, the other point is, that's $9,000.  These limits are $400 increased by inflation adjustment. They are higher than the old limits of $1,500. How is it that we can justify reducing contribution limits from $1,500 to $400 by pointing to an offer, which is not quid pro quo corruption, of $100,000 or $9,000, as in the two default judgments? Those old limits already dealt with this. These are well above the old limits. What justifies the new limits, the reduction in the limits? Now, the other part you asked about is appearance. Edelman addressed that, and as the state correctly noted, they talked about both the votes in favor of the initiative and studies that were done about the initiative. As the court in Edelman said, the contributions were necessary to combat improper influence. That was the appearance. Improper influence. Wrong standard. Okay. We need quid pro quo corruption. There's no answer. The court in Mabini v. Parks says it's neither candidate nor contributor that's likely to announce a quid pro quo. The appearance of corruption has always been an accepted justification for a campaign contribution limitation. That's citing a quorum. For large contributions. Not for any contribution. That's one of the problems with the way the state argues this. They say there's a threat of quid pro quo corruption for any contribution. That's not true. That's not what the court said. Large contributions. Okay. These were always capped for a state rep at $300, and that was reduced to $100. Where's the evidence? Let me ask you another question. On the whole, I'd like to get your perspective on who benefits from the current levels of contribution limits. In your view, or who suffers harm from the current level. The non-incumbents. Political parties that are minority parties, meaning they're at a disadvantage in a particular district, because as the court found it. But I remember in the First Amendment where the district court has considered the First Amendment challenges, it was struck down, fell off. You consider his findings based on only reverse them because they are, quote, clear air. Clear air. Right? And there's ample evidence. The non-incumbents because you think they don't have enough money? Well, they just come in here and dispatch. I mean, there's an advantage. If you've already won that seat, you're well known. You have a competency advantage. But what the court found is that based on the evidence, and there's ample evidence to support this, that these limits prevent somebody from raising sufficient funds to mount an effective campaign. I think there was evidence in the record that it's Charles Charles Vandy, the incumbents. Well, that may or may not overcome the inherent advantage of an incumbent. You asked me a general question, okay? The general answer is an incumbent always has numerous advantages over a challenger, and to overcome that, you really do have to raise more money to mount an effective campaign to overcome those advantages. These limits, therefore, disproportionately adversely affect challengers because it decides that as a district court found, you can't raise sufficient funds to mount an effective campaign. I acknowledge your answer. Are there other reasons other than money? Why are they incumbent? Certainly, we're talking about contribution limits and how they affect the whole system. And what they do is for those that don't have inherent advantages in the election, money is one of the ways, one of the principal ways to overcome that disadvantage. Normally, challengers have a disadvantage over incumbents, but so do non-traditional candidates, minority parties, parties that generally don't live in a particular district. I mean, there's all sorts of people that if you can't mount an effective campaign, then you've got a problem. And the district court found, based on ample evidence, that that's the case here with these limits. Can you turn your attention at some point to the adequately tailored aspect of why you think that's possible? Well, the easiest one on that is, as far as adequately tailored, is we are talking about reducing contribution limits from 1,500 to 400 or 300 to 100. And all of the examples, even if we credit, which I don't think you can, even if you say they're good for co-corruption, all involved amounts much larger. In fact, amounts that were already illegal under old limits. How can you justify reducing the limits when the old limits already deal with the problem? Well, I don't know whether they did or not because the fact is that these people offered 100,000. The fact that it wasn't taken didn't eliminate the risk. It didn't eliminate the appearance of an attempt to go after these people and try and buy their votes. It was an attempt that was rejected. It may be, but that doesn't remove the risk of corruption. I take your point on that. Well, there's one other point about the 100,000. It was not being given to any candidate in Montana. To be a quid pro quo corruption, a particular candidate has to receive money. That's what McCarthy said. Well, this was money given to a committee in Washington, D.C. that contributes to state legislative candidates all over the United States. $1,000, $100,000 to be used in Montana, whatever. I mean, how about for governor? So it doesn't meet that standard either. But I think a fair-minded person that would look at what happened there would say, no, we need to enclose contribution limits on politicians. In other words, we've got to punish these candidates because this group offered them something they rejected. No. I got your point on that. I'm trying to steer you over to those things. You've got a point about the first point that I've taken seriously. Okay. Now, assuming we don't agree with you on the reduction, and that's enough, what else? It seems to me that as counsel for Montana said, the bill, the criteria of the limits, are targeted toward large donations by individuals, the people who are likely to be giving amounts that would be corrupting and would tempt somebody to play the player or whatever. So what is it about the way it's implemented? I didn't find this satisfying or that tailored. I think it's right that when we're talking about large contributions, we are talking about contributions that give rise to the threat of, let's put it, pro-corruption. And the problem with the 10% is it is applied to an already low limit of $150, down to $300. They were trying to eliminate the top 10% of contributions under those limits. Now, come on, the state we're in, Montana is available for a quid pro quo exchange for $101? That has got to be the most corrupt state in the universe. And you would have politicians that would be available for that sort of corruption. So the problem with that calculation is it wasn't a calculation where there were no limits, like in Buckley. It was a calculation that was made when they already had low limits of $1500 down to $300. So they're trying to cut another piece out of the pie. And why? They say why. They testify why. They wrote that initiative. It's in the pamphlet. They said they wanted to reduce the influence of special interests, level the playing field, and reduce the amount of money spent in politics. It certainly accomplished the last one, reducing the amount of money available for campaigns. But the reason why it doesn't fit with corruption, the reason why there's no examples of corruption, is they were already so low. And secondly, it wasn't that limits weren't designed to deal with corruption. They just had to come here and try to justify them. When they pursued it, they did it. And they calculated it for illegitimate reasons. Now, one other thing, aggregate party limits. Let me ask you, are there any specific problems raised by the aggregate contributions, the limits that the direct contribution limits don't raise? Yes. First, there is no evidence of pro quo corruption between political parties and the candidates. So they don't even try to suggest anything between political parties and the candidates. Secondly, if the base limits on contributions to candidates fall, the only justification is anti-circumvention, and then you have no limits to worry about circumventing. So you cannot support the aggregate limits on circumvention. But the final point is that it prevents association, which is 2B, and it also reduces the voice of politicians, which is 2C, I mean political parties, down to a whisper. Well, how does it prevent association? I'm not sure. Well, there's 51 Republican political parties in the state of Montana. They are independent of each other. They are totally independent. Nobody controls the other in terms of what they do. But they're all lumped together in one underlined contribution limit. All right. Well, send us the first one. Well, 22% of candidates get maxed out as far as their contributions from the Republican Party or the Democrat Party. 22% of the candidates are maxed out, okay, on those contributions. That means every other political party is prohibited from contributing to them. And, of course, this happens all the time. Contributions being returned. Contributions not being made. There's all sorts of evidence of that. Is there a definitive ruling that that's the case? Because it seems like from where there's been a definitive ruling. I'm sorry? Where is the definitive ruling that that is the case? Well, it's in here in the statute. It prohibits receipt by a candidate of more than X amount of money, and it varies by office, from all political parties. Well, it seems like a party would be permitted to give 150, whatever amount per candidate each. Yes. Parties. Well, as soon as they max out, no other political party can contribute to them. And, of course, that happened to the plaintiffs here. They wanted to contribute to a state rep or a state senator or somebody, and they'd already maxed out. Now, secondly, if all political parties could contribute under that limit, so all could affiliate, then there would be $60 contributions, because you'd have to divide it by 51 into the amount. And so we're now down to trivial sums. And, of course, the effect of all this is only 4% of all the money raised by candidates in Montana are from political parties. 4%? How many political parties are organized to do this? This is one of their key justifications and functions, that by imposing this relatively low and aggregate limit so that this Republican Party county here can't contribute to this candidate because he's already maxed out by contributions from this state party over here. Let me see if there's anything else. I have one question, though. You keep hearkening back to the prior limits. Are you suggesting that those limits, if left as they were, would have been adequate to address whatever Montana's concerns were? I think it's clear the state thought so at the time, and, of course, they were not challenged. They aren't, by the way, back in effect now, because of the district court ruling that those prior limits are now back into effect. Are you challenging that issue? No, and I guarantee I wouldn't be here. I wasn't here under the prior limits, and I wouldn't be here once these go back into effect permanently. Thank you. Any other questions? I just want to make some points that I have to ask you about the aggregate limits question because I want to find out if you dispute or you agree with Mr. Block on what he was describing right now, that this is more similar to McCutcheon or is this dispute more similar to McCutcheon? We disagree with their interpretation of the argument, and the reason is that political parties, I mean, that's the way the statute decides those. If they don't have a problem with the way that the statute decides them, the better course would be to challenge the statute that decides the parties that they take on their way, and they haven't done that. So right now you think that each entity could give the amount allowed? No, I don't. I'm sorry. The amount that a political party can give is higher than what an individual or a political community can give, but where that money can come from, the statute, which they have not challenged, defines the political party or treats the political party as it's the main party and it's subcommittees or it's county central committees. Each county can put in, let's say it's $800, each county can put in for that. It's not an aggregate limit, though, in that it limits how many candidates can be contributed to the party, and as it's defined, can contribute to all of the candidates, and that's why I think it's more functionally like a base limit on political parties. As it's defined, they haven't challenged their definition. But I think it's also important that political parties have a number of other ways that they can associate with a candidate, including that they can do all of the things that Mr. Rob said that they do, which is organize to help them like candidates. But they can also provide, as part of their associational interest, they can provide staff to candidates and can provide paid staff to candidates, and that is not subject to the contribution limits. That furthers their associational rights. So they have other avenues other than just doing this fundraising and the trainings that they offer. There are lots of ways for political parties to associate with a candidate. Judge Bales, I don't know that you addressed this issue that I hadn't focused on about the prior elements and the thrust of the essence of what their argument is. Anything wrong affects it, and it affects it wrong. Sir. And as I understand that argument, Judge Booster, is that there are positions we need to do something to justify the change of limits from the one limit to the lower limit. And I think that goes completely counter to the Supreme Court precedent. What the Supreme Court says is that the dollar amount is, number one, it's not something that is really for courts. It's for the legislatures to draw a line. And they can draw that line, and if the limits are otherwise constitutional, the courts are not going to step in and change them. The courts are not going to require any sort of, you know, have a scalpel to probe. They don't have to justify why the limit went from there, from a particular place to another. Now, it may be that the limits get so low that it bumps up against another tailoring factor, and that's a problem. But I think the question is, does the limit get too low so that the candidate can't amass resources now? Judge, is there any alternative clue with limits from the point of view of reducing monies on direct limits such that they do not allow candidates with sufficient money to campaign themselves in court? I think, Judy, I think that's correct. The question is where you look at are limits too low. It's not under the sufficiently important interest standard. It's not under the narrow focus. It's under what is the impact on the candidate. Thank you. All right. Thank you very much, Jeff. Very interesting argument presentation. In case the students agree. Thank you.
judges: Fisher, Bea, Murguia